**TRINITY AMERICAN CORPORATION,
Petitioner,**

v.

**The UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Respondent.**

No. 97–2059.

United States Court of Appeals,
Fourth Circuit.

Argued May 6, 1998.

Decided Aug. 4, 1998.

**ARGUED:** Christopher G. Browning, Jr., Hunton & Williams, Raleigh, North Carolina, for Petitioner. Yvette Marie Wilkerson–Barron, United States Department of Justice, Washington, D.C., for Respondent. **ON BRIEF:** L. Neal Ellis, Jr., Matthew P. McGuire, Hunton & Williams, Raleigh, North Carolina, for Petitioner. Lois G. Schiffer, Assistant Attorney General, Environment & Natural Resources Division, United States Department of Justice, Washington, D.C.; Richard T. Witt, Office of General Counsel, Environmental Protection Agency, Washington, D.C.; David Montegomery Moore, Office of Regional Counsel, Region IV, Environmental Protection Agency, Atlanta, Georgia, for Respondent.

Before WIDENER and MOTZ, Circuit Judges, and HOWARD, United States District Judge for the Eastern District of North Carolina, sitting by designation.

Petition dismissed by published opinion. Judge DIANA GRIBBON MOTZ wrote the opinion, in which Judge WIDENER and Judge HOWARD joined.

## OPINION

DIANA GRIBBON MOTZ, Circuit Judge:

Trinity American Corporation petitions for review of an emergency order issued under the Safe Drinking Water Act. The order mandates that Trinity systematically sample groundwater within a three-quarter-mile radius west-southwest of its property to determine whether the water meets federal standards, and provide bottled water to anyone in this area whose groundwater fails to meet these standards until the groundwater is found to be without contaminants. Because the order constitutes a permissible exercise of the Environmental Protection Agency's emergency statutory powers, we dismiss the petition.

### I.

Trinity owns and operates a polyurethane foam plant in the Glenola Community of Randolph County, North Carolina. In 1980, Trinity purchased eight acres of land on which it constructed its foam plant. At that time, Trinity also leased an additional adjacent 15 acres from Thomasville Products, Inc. (the Thomasville property), and subleased this tract to Guilford Fabricators, a business separate and independent from Trinity. Eleven years later, in 1991, Trinity purchased the Thomasville property, and Guilford Fabricators remained Trinity's lessee.

Trinity's land is composed of a top layer of saprolite—a soft, earthy, clay-rich decomposed rock. This upper layer contains an aquifer allowing groundwater to flow downstream in a west-southwesterly direction. Thus, any contaminants dumped on Trinity property that migrate to this upper aquifer would ultimately travel west-southwest, away from Trinity property. Below the upper aquifer lies fractured bedrock that creates a lower aquifer. Water that descends from the upper to the lower aquifer moves freely through a series of crisscrossing fractures. The migratory path for water in the lower aquifer is, consequently, less certain than in the upper aquifer, although there is a "close interconnection" between the two.

Trinity's own experts have determined that about 100 homes are located in a three-quarter-mile area west-southwest of Trinity, homes that likely draw their well water supply from water migrating from the Trinity aquifers. These homes use this water for drinking, cooking, food preparation, oral hygiene and bathing.

Prior to Trinity's ownership or occupation, the land had been contaminated with toxic chemicals. Thomasville had regularly emptied vats of solvent wastes on the ground surface and had used the area as a landfill. However, after Trinity first occupied the land in 1980, it engaged in its own extensive dumping and waste mismanagement. As early as 1981, Trinity's neighbors began noticing these practices. In a sworn declaration, one neighbor, David Deaton, stated that he witnessed Trinity dumping a "chemical solution onto the ground outside its plant" and "numerous leaking and corroded chemical drums" on Trinity property throughout the 1980s and '90s. After Deaton reported Trinity's dumping, the North Carolina Department of Environmental Health and Natural Resources ("the state health department" or "the department") advised Deaton to test his water supply for "toluene, solvents and pesticides now under E.P.A. guidelines." Other neighbors, the Fulchers, informed the Environmental Protection Agency (EPA) in writing that throughout the 1980s they had witnessed the effects of Trinity dumping of chemical solvents and fuel oil into a creek running through their property, and that "if not for the dead pets and unusual odors, these spills would have gone undetected."

In 1985, Trinity dumped 200 gallons a day of "boiler blowdown" directly onto the ground and into a creek that runs through its property. This boiler blowdown contained high levels of chromium, which the state

health department found to be a hazardous waste. The department also reprimanded Trinity for improper storage of hazardous latex waste and fiber particles that were being washed into the ground when it rained. In 1989, after Trinity dumped a significant amount of diesel fuel directly onto the ground, polluting both the soil and an adjacent stream, the state health department fined the company and forced it to remove 28,000 pounds of soil.

In 1994, the state health department sampled the groundwater from two wells located on Trinity property, and learned that Trinity's ground water was contaminated with dichloroethene and trichlorethene in excess of the maximum allowed by EPA. In an effort to investigate further this groundwater contamination, the department ordered Trinity to perform a comprehensive site assessment and formulate a corrective action plan focusing on 19 "areas of concern," which included sampling water from approximately 30 areas on and immediately adjacent to Trinity property. This site assessment revealed that toxic chemicals contaminated the well that supplied Trinity's drinking water, a large plume of water extending beyond the property, and the well supplying drinking water to the 3–D Upholstery Shop, located immediately west of Trinity property. In response to the site assessment, Trinity provided bottled water to all of its employees, installed a granular activated carbon treatment system, and advised 3–D Upholstery to discontinue using its well.

In 1996, the Randolph County Health Department, in consultation with the state health department, issued Trinity a "final notice" to "cease and desist" from chronic pumping and disposal of sewage and industrial wastewater directly onto the ground surface. Shortly thereafter, the state health department conducted an industrial wastewater inspection of Trinity's property and found several violations of North Carolina health codes due to improper storage and disposal of sewage and industrial waste. The record does not indicate that state or local health authorities issued any fine or penalty for these violations.

However, in December 1996, Trinity entered into a consent decree with the state health department, attempting to remedy the problems found in the site assessment ordered as a result of the 1994 testing. In the decree Trinity agreed to conduct quarterly sampling of groundwater from 19 wells in the vicinity of its site to determine the extent of the groundwater contamination.

A short time later, EPA began investigating potential groundwater contamination in and around the Trinity site. In addition to the contaminated water found in the site assessment, EPA learned of contaminated water in two other wells. One well, the Taylor well, located approximately 1500 feet southwest of Trinity property, contained contaminants similar to those found in Trinity's groundwater at levels so high that the Taylor family was unable to drink the water safely. At EPA's request, Trinity agreed to and still does provide the Taylor family with bottled water. The other well, the Madden well, found adjacent to Trinity property, has contained an "irregular" pattern of both low and high levels of contaminants at different times. The record does not indicate the Madden well's present condition.

On the basis of its investigation of the Trinity property, EPA issued an emergency order in which it concluded that chlorinated solvents and petroleum hydrocarbons from the Trinity site had been detected above maximum allowable levels in private supply wells located to the west-southwest of the Trinity property. Due to the high concentrations of these contaminants, EPA found that "current use of the ground water may present an imminent and substantial endangerment to human health." The agency also determined that, although the state health department repeatedly cited Trinity for violating North Carolina environmental laws and entered into a remedial consent decree with Trinity, the state's efforts were insufficient to protect the public health. EPA expressly noted in the order that it had "consulted with the State and local government regarding the information upon which this Emergency Administrative Order is based" and the state did not "intend to take" the actions that EPA determined were "neces-

sary to protect the health of persons who consume or use water from the contaminated portion of the bedrock acquifer."

The order requires Trinity to identify and test all water supply wells in a three-quarter-mile pie-shaped area west-southwest of Trinity property "using an EPA approved testing method." The sampling is to occur every 90 days until EPA determines that the groundwater does not contain contaminants above the maximum contaminant levels permitted under federal regulations. *See* 40 C.F.R. § 141.1 *et seq.* (1997). If a sample contains contaminants above the maximum levels, Trinity must provide safe drinking water to persons who use the contaminated wells until EPA determines that the well no longer contains unsafe levels of contaminants. If a well cannot consistently provide water that meets EPA standards, Trinity must provide a permanent, alternative source of safe drinking water to the users of that well.

## II.

We exercise original jurisdiction over a petition for review of any "final action of the Administrator" under the Safe Drinking Water Act of 1974 (the Act). 42 U.S.C.A. § 300j–7(a)(2) (West Supp.1998); *see also Imperial Irrigation Dist. v. EPA,* 4 F.3d 774 (9th Cir.1993). EPA does not dispute that the emergency order at issue here constitutes a "final action" under the Act. *See Chamblee v. Espy,* 100 F.3d 15, 17 (4th Cir. 1996).

As we have previously recognized, Congress enacted this statute "to assure that water supply systems serving the public meet minimum standards for protection of public health." *Montgomery County v. EPA,* 662 F.2d 1040, 1041 (4th Cir.1981) (quoting H.R.Rep. No. 93–1185, at 35–36 (1974), *reprinted in* 1974 U.S.C.C.A.N. 6454, 6487) (hereinafter "House Report"). The Act authorizes EPA to establish drinking water regulations that specify maximum levels of contaminants that may have an adverse affect on the health of those using the water. *See* 42 U.S.C.A. § 300g–1 (West 1991 & Supp.1998).

Upon meeting certain requirements, states may obtain primary responsibility for administering and enforcing these EPA-mandated standards. *See* 42 U.S.C.A. § 300g–2. However, even when a state has obtained primary responsibility, the Act specifically preserves certain emergency powers for EPA. *See United States v. Hooker Chem. & Plastics Corp.,* 749 F.2d 968, 988 (2d Cir.1984). Section 1431 of the Act, proscribing EPA's emergency powers, provides:

[n]otwithstanding any other provision of this subchapter, the Administrator, upon receipt of information that a contaminant which is present in or is likely to enter a public water system or an underground source of drinking water may present an imminent and substantial endangerment to the health of persons, and that appropriate State and local authorities have not acted to protect the health of such persons, may take such actions as he may deem necessary in order to protect the health of such persons. To the extent he determines it to be practicable in light of such imminent endangerment, he shall consult with the State and local authorities in order to confirm the correctness of the information on which action proposed to be taken under this subsection is based and to ascertain the action which such authorities are or will be taking. The action which the Administrator may take may include (but shall not be limited to) (1) issuing such orders as may be necessary to protect the health of persons who are or may be users of such system (including travelers), including orders requiring the provision of alternative water supplies by persons who caused or contributed to the endangerment, and (2) commencing a civil action for appropriate relief, including a restraining order or permanent or temporary injunction.

42 U.S.C.A. § 300i(a).

Thus, EPA may exercise its emergency powers "notwithstanding any other provision" in the Act. *Id.* The agency is, in Judge Friendly's words, "authorized to overlook technological and economic feasibility" and, "unlimited by other constraints, [to] giv[e] paramount importance to the sole objective

of the public health." *Hooker,* 749 F.2d at 988. The House Report discussing the emergency powers provision stresses Congress' intent to "confer completely adequate authority to deal promptly and effectively with emergency situations which jeopardize the health of persons." House Report, 1974 U.S.C.C.A.N. at 6487. Indeed, EPA's powers under this provision are "intended to override *any* limitations upon the Administrator's authority found elsewhere" in the Act. *Id.* (emphasis added).

EPA may issue any order "as may be necessary to protect the health of persons who are or may be users" of a public drinking water system. 42 U.S.C.A. § 300i(a). "Such orders may be issued to obtain relevant information about impending or actual emergencies, to require the issuance of notice so as to alert the public to a hazard, to prevent a hazardous condition from materializing, to treat or reduce hazardous situations ... or to provide alternative safe water supply sources in the event any drinking water source which is relied upon becomes hazardous or unusable." House Report, 1974 U.S.C.C.A.N. at 6487.

■ So that EPA can act promptly and effectively when a threat to public health is imminent, courts must ensure that the agency's power under the Act remains "relatively untrammeled." *Hooker,* 749 F.2d at 989. Accordingly, we approach challenges to an EPA emergency order with circumspection, recognizing such challenges result in a "diversion of time and resources as well as the risk that a court will err in evaluating the positions of [EPA] ... on technological and scientific questions at the outer limits of a court's competence." *Id.* (emphasis added).

■ A court must uphold any EPA action taken pursuant to the Act unless the action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C.A. § 706(2)(A) (West 1996) (Administrative Procedure Act); *see also Montgomery County,* 662 F.2d at 1043. Under this "highly deferential standard," therefore, "our task" is limited to "scrutiniz[ing] the EPA's activity to determine whether the record reveals that a rational basis exists for its decision." *Natural Resources Defense*

*Council, Inc. v. EPA,* 16 F.3d 1395, 1401 (4th Cir.1993).

■ In reviewing EPA's action, we recognize that the Act, like most environmental statutes, is complex and requires sophisticated evaluation of complicated data. Accordingly, we "do[ ] not sit as a scientific body, meticulously reviewing all data under a laboratory microscope." *Id.; see also Natural Resources Defense Council v. EPA,* 824 F.2d 1211, 1216 (D.C.Cir.1987) ("it is not for the judicial branch to undertake comparative evaluations of conflicting scientific evidence"). Rather, if EPA "fully and ably explain[s] its course of inquiry, its analysis, and its reasoning" sufficiently enough for us to discern a rational connection between "its decision-making process and its ultimate decision," we will not disturb EPA's action. *Natural Resources,* 16 F.3d at 1401.

With these principles in mind, we turn to Trinity's challenges to the emergency order.

### III.

Trinity maintains that because it assertedly did not know until 1993 about the Thomasville landfill, which played a significant role in contaminating its groundwater, it is an "innocent owner" not liable for any of the remedial action EPA has ordered in the emergency order.

### A.

■ Trinity points to the "innocent owner" exemption from liability in the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C.A. § 9601 *et seq.* (West 1995 & Supp.1998). Generally, CERCLA imposes strict liability on the owner of the property at the time an enforcement action is brought, even if that party did not own the property when the pollution took place. *See* 42 U.S.C.A. § 9607(a)(1); *New York v. Lashins Arcade Co.,* 91 F.3d 353, 359 (2d Cir.1996) (a property owner is liable under CERCLA "notwithstanding the fact that it did not own the [property] at the time of disposal of the hazardous substances"). However, CERCLA expressly allows a property owner, in

certain narrowly defined situations, to escape the statute's strict liability regime. To claim this statutory innocent owner exemption, a property owner must demonstrate "(1) that another party was the 'sole cause' of the release of hazardous substances and the damages caused thereby; (2) that the other, responsible party did not cause the release in connection with a contractual, employment, or agency relationship with the [property owner]; and (3) that the [property owner] exercised due care and guarded against the foreseeable acts or omissions of the responsible party." *Westfarm Associates Ltd. Partnership v. Washington Suburban Sanitary Com'n,* 66 F.3d 669, 682 (4th Cir.1995) (quoting 42 U.S.C.A. § 9607(b)(3)).

■ Trinity maintains that the Safe Drinking Water Act provides a similar "innocent owner" exemption. But, in fact, no similar statutory innocent owner provision appears anywhere in the Act. Nor is it clear that a property owner who conducts *no* environmental examination of its property prior to purchase, as Trinity apparently failed to do here, and who thereafter contributes to the environmental contamination, could escape liability even under the "innocent owner" exemption as defined in CERCLA. *Cf. Lashins,* 91 F.3d at 361 (landowner, who inquired into potential contamination *before* purchasing property, can invoke "innocent owner" defense under CERCLA to avoid liability for pollution caused *solely* by previous user of property).

Nonetheless, Trinity argues that the plain language of the Safe Drinking Water Act and its legislative history provide an "innocent owner" defense. The Company relies on the language in § 1431 authorizing the administrator to order "the provision of alternative water supplies by persons who caused or contributed to the endangerment." 42 U.S.C.A. § 300i(a). This language does not exempt Trinity or any other party from liability under the Safe Drinking Water Act. Rather, it simply limits the actions of the EPA administrator in one, and only one, instance, *i.e.* the agency can only order a violator "who caused or contributed to the endangerment" to provide "alternative water supplies." *Id.* This is a small restriction on the administrator's otherwise broad statutory power to "take such actions as he may deem necessary to protect the health" of the public, including "but ... not ... limited to" the "issuing [of] such orders as may be necessary to protect the [public] health." *Id.*

The statute's legislative history also fails to assist Trinity. In the House Report accompanying § 1431, Congress reiterated that the legislation authorized the EPA administrator to impose general emergency orders on "*any* ... person whose action or inaction requires prompt regulation to protect public health." House Report, 1974 U.S.C.C.A.N. at 6487.

Thus, Trinity's claim to an innocent owner exemption fails.

## B.

■ Nor can Trinity prevail on the narrower argument that no evidence supports EPA's conclusion that the company "contributed to" the contamination and so can be properly ordered to provide "alternative water supplies." As we noted in another Safe Drinking Water Act case, "because of the country's varied hydrogeological formations, Congress necessarily vested broad discretion in the administrator." *Montgomery County,* 662 F.2d at 1043. Our role, therefore, is limited to determining whether "the record reveals that a rational basis" exists for the actions of the EPA administrator. *Natural Resources,* 16 F.3d at 1401.

Here, the record plainly provides evidence on which EPA could rationally conclude that Trinity's polluting activities "contributed to" the contamination of the water supply west-southwest of Trinity property. Throughout the 1980s, Trinity had been cited for numerous instances of improper waste handling and dumping of hazardous materials such as "boiler blowdown," toxic runoff, diesel fuel, and industrial wastewater. The company's neighbors had also complained to EPA on several occasions regarding Trinity's poor waste handling practices. The company's own testing documented that at least three wells (3–D Upholstery, Trinity, and Madden) were contaminated, and that one large plume of contaminated water extended beyond the Trinity property in a west-southwesterly di-

rection. In addition to these water sites, the Taylor well has been contaminated to the point that the water is now undrinkable.

That a number of the same chemicals found in the contaminated groundwater at Trinity were also found off-site, in the three-quarter-mile area, further supports EPA's conclusion that Trinity contributed to the groundwater contamination presently found in that area. Specifically, the Taylor well, 3–D well, and Trinity's own well were contaminated with 1,1–dichloroethene (1,1 DCE), 1,1,1-trichloroethane (1,1,1 TCA) and tetrachloroethene (PCE). The Madden well also contained 1,1,1 TCA above maximum allowable levels—the same chemical used in its original form in Trinity's manufacturing process.[1]

Armed with this information, EPA did not act arbitrarily or capriciously in ordering Trinity to provide "alternative water supplies." EPA could rationally determine that Trinity caused its groundwater to become contaminated, which in turn, contributed to the contamination of the Taylor well located downstream from the Trinity site. Given that water in Trinity's upper aquifer flows in a west-southwesterly direction, EPA could further conclude that Trinity contributed to contaminating other wells in the three-quarter-mile area delineated in the emergency order.

Nor do EPA's conclusions that "other potential sources" near Trinity "may have contributed to groundwater contamination" render irrational EPA's finding that Trinity is itself a source of contamination. Under § 1431, in order to be subject to an EPA command to supply alternative water supplies, Trinity need not be the *sole* cause of the hazardous situation. Rather, Trinity need only have "contributed to" it. Put an-

other way, EPA need not *rule out* other possible sources of contamination for it to properly exercise its emergency power to take this action against Trinity, so long as EPA's determination that Trinity contributed to the hazardous condition is rational, as it is.[2]

## IV.

■ Trinity also maintains that the emergency order impermissibly displaces North Carolina's authority under the Act to control groundwater contamination. The company contends that the state has taken sufficient steps to remedy contamination and so to sustain EPA's emergency order would effectively "preempt" the state's own efforts in contravention of the Act.

Section 1431 provides EPA with broad emergency powers to act as it "deem[s] necessary" to protect "the health of persons who are or may be users of [a public water] system," if "appropriate State and local authorities have not acted to protect the health of such persons." 42 U.S.C.A. § 300i(a). Trinity asserts that because the state did take some action to protect drinking water quality in the vicinity of the Trinity site, this statutory language means that EPA, as a matter of law, "ha[d] no authority to issue emergency orders such as the one at issue in this case." Brief of Petitioner at 15–16.

■ That argument is meritless. It would mean that any action by a state—even if minor or ineffective—would strip EPA of its statutory emergency powers. Such a result would be at odds with the clear purpose of the statute—to preserve and protect the public health. Nor does any language in the statute require such an illogical result.

1. Although numerous other chemicals were used in Trinity's manufacturing process, we cannot determine from the record before us how they would interact with the groundwater to possibly degrade into any of the chemical compounds detected in the water samplings. Neither EPA nor Trinity enlightens us on this matter. In any event, based on the evidence above, EPA could rationally determine that Trinity contributed to a potentially hazardous threat of groundwater contamination to the wells located west-southwest of Trinity property.

2. Trinity's suggestion that EPA's determination lacks a rational basis because none of Trinity's numerous instances of improper waste management involved the release of those contaminants deemed hazardous by EPA, fails for a total lack of proof. Although the company claims that it was never given an opportunity to submit such proof, the record reveals that after EPA issued the emergency order, it permitted Trinity to introduce additional evidence. Trinity nonetheless failed to provide any evidence to prove this contention.

Rather than establishing state action as a bar to EPA action, as Trinity suggests, the statutory language provides the administrator of EPA with great discretion—to take "such actions as he may deem necessary" to protect the users of public drinking water when state authorities have not acted to protect the public health of such persons. State health authorities, therefore, must not only have acted, but acted in a way adequate to protect the public health; and EPA, the agency with expertise in this area, determines if the state efforts were adequate.

Perhaps recognizing the futility of its statutory language argument, Trinity heavily relies on a portion of the statute's legislative history. Specifically, Trinity cites to a passage in the House Report counseling EPA to "refrain from precipitous preemption of effective State or local emergency abatement efforts" in exercising its own emergency powers. House Report, 1974 U.S.C.C.A.N. at 6487. Trinity maintains that this language prohibits EPA's emergency order in this case; the company ignores the report's very next statement: "[h]owever, if State or local efforts are not forthcoming in a timely fashion or *are not effective to prevent or treat the hazardous condition,* this provision should not bar prompt enforcement by the Administrator." *Id.* (emphasis added).

If the statute is in any way unclear on the point, and we do not believe it is, the House Report makes plain that, under the statute, EPA retains authority to act when it has a rational basis for concluding that a state's efforts at abating a potentially hazardous situation are "not effective." *Id.* Contrary to Trinity's argument, the legislative history indicates that Congress contemplated situations where a state attempts to prevent or remedy hazardous situations, but due to the ineffectiveness or untimeliness of these efforts, is unsuccessful. EPA does not "precipitous[ly] preempt[ ]" state efforts when the agency reasonably determines that the state's actions were "not effective" in preventing a hazardous situation. The question is not, as Trinity seems to believe, whether the state acted at all or acted in good faith to eliminate the environmental problems. *See* Brief of Petitioner at 15. Rather, the question before us is whether EPA could reasonably con-clude that state's efforts, while certainly genuine, were not sufficiently effective to protect the public health.

■ Review of the record unquestionably demonstrates that sufficient evidence supports EPA's determination that the state's efforts were inadequate. The consent decree entered into by Trinity and the state health department required Trinity to provide quarterly groundwater monitoring reports from wells on its own site. However, a careful reading of the consent decree reveals that it focuses almost exclusively on monitoring the contamination of groundwater *on* Trinity property. It specifically calls for quarterly sampling of 19 wells on and immediately adjacent to Trinity property. It does not directly address the three-quarter-mile, 100–home area that EPA believes could be affected by Trinity's contaminated groundwater. Moreover, although the state health department has apparently sampled, in some fashion, 79 of approximately 100 wells within the three-quarter-mile area, notwithstanding the consent decree, numerous wells in this area have not been sampled and, indeed, it is unclear whether all of the wells in the area have even been identified.

Furthermore, EPA points out that *none* of the sampling done by Trinity or the state health department meets EPA standards. Because the testing did not follow EPA protocols in properly accounting for seasonal fluctuations in groundwater flow, its accuracy has not been assured. The failure to follow EPA-mandated standards is apparently undisputed—the company has provided no evidence (and, indeed, made no argument) that the sampling upon which it relies was conducted in accord with EPA's standards. Congress empowered EPA to set such standards, which, after much study, the agency did. *See* 40 C.F.R. § 121.24 (1997). Certainly, it is reasonable for EPA to conclude that testing that is not in compliance with the standards it has fashioned and publicized does not adequately protect the public health.

Accordingly, based on this record, EPA's efforts to implement an emergency order requiring systematic and careful sampling of all wells within a three-quarter-mile radi-

us of Trinity did not improperly preempt state efforts. EPA could conclude that the state health department, while undertaking a concerted, good faith effort to remedy the hazardous groundwater situation in the immediate vicinity of the Trinity plant, did not provide a sufficiently effective plan to protect the health of those living downstream from Trinity.

### V.

■ Trinity contends that EPA cannot rationally find "imminent and substantial endangerment" requiring prompt emergency action under § 1431 because no evidence exists that any individuals are *actually drinking* contaminated water. Again, as with Trinity's innocent owner and state preemption arguments, the statute provides no support for this contention. The Act simply does not require such evidence.

Section 1431 confers authority on EPA to issue an emergency order "upon receipt of information that a contaminant which *is present in or is likely to enter* a public water system or an underground source of drinking water *may present* an *imminent and substantial endangerment* to the health of persons." 42 U.S.C.A. § 300i(a) (emphasis added). Thus, the plain language of the statute authorizes EPA to act even when no evidence exists that anyone is actually drinking contaminated water. All that EPA needs is "information that a contaminant, which is likely to enter ... an underground source of drinking water may present an imminent substantial endangerment to the health" of persons who "may be users of" the water system. *Id.; see also* House Report, 1974 U.S.C.C.A.N. at 6488 ("while the *risk of harm must be 'imminent'* for the Administrator to act, the *harm itself need not be* " (emphasis added)). Congress stressed that it "intends this language [to] be construed by the courts and the Administrator so as to give paramount importance to the objective of protection of the public health," and that "[a]dministrative and judicial implementation of this authority must occur *early enough to prevent the potential hazard from materializing.*" House Report, 1974 U.S.C.C.A.N. at

6488 (emphasis added); *see also Hooker,* 749 F.2d at 988.

EPA, therefore, may invoke its powers under § 1431 even if there is only an "imminent likelihood of the introduction into drinking water of contaminants that may cause health damage after a period of latency." House Report, 1974 U.S.C.C.A.N. at 6488. As noted in *United States v. Waste Indus., Inc.,* 734 F.2d 159, 165 & n. 3. (4th Cir.1984), the Safe Drinking Water Act's "imminent and substantial endangerment" provision "means that for the United States to take action the *risk* of harm must be imminent but the harm itself need not be" (emphasis added).

Because only the "risk of harm" must be "imminent," EPA need not demonstrate that individuals are drinking contaminated water to justify issuing an emergency order. Rather, EPA must demonstrate the "imminent likelihood" that the public may consume contaminated water unless prompt action is taken to "prevent" a "potential hazard from occurring." House Report, 1974 U.S.C.C.A.N. at 6488. EPA has clearly met this requirement here. The agency has demonstrated that dangerous levels of contaminants exist in Trinity's water supply, which migrates west-southwest from Trinity property. EPA has determined that these contaminants pose great risk to human health and may very well be found in other, yet to be tested, wells within this west-southwest area.

■ Alternatively, Trinity contends that, even if EPA need only find an imminent "risk of harm," no evidence supports such a finding. This is so, according to Trinity (which does not address the Madden well), because the only well off of Trinity property that EPA has conclusively identified as contaminated, the Taylor well, no longer poses a "risk of harm" since Trinity currently supplies the Taylors with bottled water. The company relies on two cases to support this contention. *See Leister v. Black & Decker, Inc.,* 117 F.3d 1414, No. 96–1751, 1997 WL 378046 (4th Cir. July 8, 1997) (unpublished), and *In re Bell Petroleum Services,* 3 F.3d 889 (5th Cir.1993). In fact, neither case assists Trinity here.

In *Leister,* we held, in an unpublished opinion, that the landowners who sued an alleged groundwater polluter, Black & Decker, could not establish an "immediate serious threat" to the drinkability of groundwater under the Resource Conservation and Recovery Act, 42 U.S.C.A. § 6901 *et seq.* (West 1995)(RCRA). *Leister,* 1997 WL 378046, at *3. We reasoned that because Black & Decker had installed a sophisticated filtration system that remedied previous groundwater contamination, the Leisters could not demonstrate an "immediate serious threat of harm" to any users of groundwater flowing from Black & Decker property and so their RCRA claim failed. *Id.*

Here, no filtration system like that at issue in *Leister* purifies the water flowing from Trinity property.[3] Quite the opposite, the Taylor well remains contaminated, as does at least one large plume of water that extends as far as 500 feet beyond the Trinity property into an area that Trinity itself recognizes includes approximately 100 homes. Furthermore, while the state health department has sampled a number of the wells in this area, these samplings were neither complete nor systematic, rendering the extent of the hazardous contamination caused by Trinity water not fully understood. Accordingly, unlike *Leister,* record evidence here suggests that the presence of these substances poses an immediate serious threat of harm, not only to the Taylors but to other families downstream from Trinity who may be exposed to such contaminated water.

Nor does *In re Bell Petroleum* aid Trinity. There, the Third Circuit held that EPA, under CERCLA, could not recover costs associated with installing a water filtration system to remedy contamination purportedly caused by Bell Petroleum because EPA produced no evidence that anyone was drinking the contaminated water *and* "made no attempt to learn whether anyone was drinking the water." *Bell* 3 F.3d at 905. The court explained that the contaminated water was supplied only to commercial establishments,

which were not using it as drinking water, and that if private residents had been using the contaminated water, the order did not require them to connect to the new filtration system. *Id.* at 906.

Here, by contrast, the emergency order calls for a uniform well sampling to determine precisely what EPA failed to identify in *Bell*—the effect of the contaminants on surrounding wells used for drinking water. Unlike the order in *Bell,* the order at issue here does not compel the asserted polluter, Trinity, to supply alternative drinking water to surrounding landowners who *may not be exposed* to any threat of harm. Rather, the order here is far more narrowly tailored, requiring Trinity to provide purified water *only* to those persons who actually utilize contaminated wells. While the contaminated water supply in *Bell* solely affected commercial establishments that did not use drinking water, Trinity's own expert has identified 100 private homes whose water may be potentially contaminated. In *sum, Bell* does not assist Trinity.

## VI.

We briefly address Trinity's remaining arguments, none of which we find persuasive.

 The company claims that EPA's order is irrational because once a well within the three-quarter-mile radius is deemed contaminated, Trinity is obligated to provide non-contaminated drinking water to any individual user of that well even though EPA cannot demonstrate that Trinity "caused" the contamination of that specific well to the exclusion of other polluters. This argument suffers from the same infirmity discussed *supra* in § III.B.—the Act does not require EPA to determine that Trinity is the *sole cause* of the hazardous situation that the agency seeks to remedy. Rather, EPA need only determine that Trinity *contributed* to the hazardous condition here, namely the serious potential for groundwater contamina-

---

**3.** We note that one of the contaminated Trinity wells was equipped with an activated carbon treatment system. Trinity, however, does not contend that this apparatus removes any "immediate serious threat of harm" from any of the wells. The company fails to mention this system at all, but rather relies solely on its provision of bottled water to the Taylors as evidence that no serious threat of harm exists.

tion in the area surrounding Trinity property. After EPA has made this determination, § 1431 expressly authorizes the agency to impose this very kind of remedial order. *See* 42 U.S.C.A. § 300i(a) (EPA may issue orders "requiring the provision of *alternative water supplies* by persons who have caused or contributed to the endangerment" (emphasis added)).

 Trinity also objects to the portion of the emergency order mandating that it offer "reasonable sums of money" to local property owners to gain access to their wells for sampling. Trinity argues that the order thus provides local landowners with an opportunity to engage in "extortion," exacting exorbitant fees from Trinity to access such wells. This contention amounts to no more than gross speculation. Trinity provides no evidence that it is the actual or potential victim of such "extortion." Moreover, the emergency order does not in any way compel Trinity to succumb to such "extortion," for it mandates only that the company provide *"reasonable* sums of money" in exchange for access to private groundwater wells. The order contemplates regular reports and continued contact between the company and EPA. If any local landowner should attempt "extortion" of Trinity, the company surely can bring this to the agency's attention.

Finally, Trinity maintains that the portion of the emergency order mandating that it identify all potential users of the contaminated wells in the three-quarter-mile area is "limitless in scope" and amounts to unnecessary "census taking." Brief of Petitioner at 25. This assertion is simply untrue. EPA's emergency order requires, as part of a comprehensive well sampling plan, that Trinity document those persons who use wa-

ter from the wells that it samples. We cannot see, based on a common sense reading of the EPA order and the record before us, how Trinity is subject to a "limitless" or unduly burdensome task.

### VII.

For the foregoing reasons, the petition for review is *DISMISSED.*[4]

---

4. After Trinity noted this appeal, and the certified administrative record and all briefs had been filed, the company moved to supplement the record with a "document unavailable to Trinity until after the filing of its reply brief." Although we granted Trinity's motion and EPA's subsequent similar motion, we did so on the express condition that grant of the motions did not indicate "any opinion on the competence, relevance or materiality of any of the said papers" or "the extent, if any, to which they should be considered in deciding the case." In fact, neither of the supplemental documents—an internal memoran-

dum of the state health department, dated October 22, 1997, and EPA response to that memorandum, dated April 28, 1998—was available to EPA when it issued its July 1, 1997, emergency order. Review of agency action is limited to the administrative record before the agency when it makes its decision. *See Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973); *see also Virginia Agricultural Growers Ass'n, Inc. v. Donovan,* 774 F.2d 89, 92 (4th Cir.1985). Accordingly, we have determined that consideration of these *post hoc* documents in deciding this administrative appeal is inappropriate.